FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 JUN 16  AM 10: 38

U.S. DISTRICT COURT
N.D. OF ALABAMA

STEPHEN L. CAGLE,                      )
                                       )
            Plaintiff,                 )
                                       )
v.                                     )   CIVIL ACTION NO. 97-JEO-2591-S
                                       )
TEACHERS INSURANCE AND                 )
ANNUITY ASSOCIATION,                   )   **ENTERED**
                                       )
            Defendant.                 )   JUN 1 6 1999.

## MEMORANDUM OPINION

In this action, which was commenced in Jefferson County Circuit Court, plaintiff Stephen

L. Cagle ("the plaintiff"), asserts that defendant Teachers Insurance and Annuity Association

("the defendant") denied him benefits he is entitled under a group disability insurance policy

issued by the defendant. He also asserts that the defendant acted in bad faith. He requests

various remedies, including punitive damages. Presently before the court is the defendant's

motion for summary judgment on the plaintiff's bad faith claim and his request for punitive

damages. (Doct. 16).[1]  Also before the court is the defendant's motion to strike certain

evidentiary exhibits submitted by the plaintiff in opposition to the motion for summary

judgment. (Doct. 20).  Upon consideration, the court finds that the defendant's motion to strike is

due to be granted in part and denied in part and the defendant's motion for summary judgment is

due to be granted.

---

[1] References to "Doct.___" are to the numbers assigned by the Clerk of the Court to a particular pleading. References to
"Ex.___" are to the exhibits attached to each document in a pleading. References to "TX___" are to the "Bates" stamped
number on a document that appears in the lower right-hand corner.

*33*

## I. FACTUAL SUMMARY

The plaintiff was injured on August 15, 1996, while working with a patient at the

University of Alabama at Birmingham Hospital. At the time, he was covered by a group

disability insurance policy issued by the defendant. The group policy provides that disability

payments are "payable as of the first day following 90 days of continuous Total Disability."

(Doct. 17, Ex. 1 A, TX0383). "Total Disability or Totally Disabled" is defined by the policy:

> The definition Total Disability or Totally Disabled is amended to read as follows:
>
> (A)(1)  For the first twenty-seven months of Disability, being completely unable due to
> sickness, bodily injury, or pregnancy to perform the Employee's normal
> occupation and not performing any other occupation; and
>
>   (2)  after the first twenty-seven months, being unable due to sickness, bodily injury, or
> pregnancy to perform any occupation for which the Employee is reasonably suited
> by education, training, or experience; or
>
> (B)  working, but being unable due to sickness, bodily injury, or pregnancy to earn
> more than 80% of his or her Increasing Monthly Wage Base. The employee must
> be under the regular care of a Physician other than him or herself.

(Doct. 17, Ex. 1 A, Rider 3, TX0401).

The plaintiff filed a disability claim with the defendant on November 20, 1996. (*Id.,* Ex.

1, Jordan Affidavit, p. 2). He also submitted an Employee Statement form in which he stated

that his disability was the result of an injury to his back that occurred on August 15, 1996, while

he was "pulling a patient up in bed." (*Id.*, Ex. 1 B). Two days after the claim was filed, the

defendant requested additional medical information from various health care providers.[2] The

plaintiff was informed, and he was requested to contact the providers so the needed information

---

[2] The providers included Dr. MacMurray, Dr. Chiou, Dr. Felgner, and UAB Hospital. (Doct. 17, Ex. 1 D and E).

2

could be released. The plaintiff was also informed that Kathleen Stenger was the Group Benefits Analyst assigned the case. (*Id.*, Ex. 1 D, at TX0166).

Medical information was received from Dr. Godfryd, Dr. Felgner, Dr. MacMurray, Dr. Kezar, and UAB Hospital. It was reviewed by Stenger and the defendant denied the plaintiff's claim when it determined that the medical information did not support the plaintiff's "complaints of disability and inability to perform [his] occupation." (*Id.*, Ex. 1 D, at TX0165). The plaintiff was notified of this decision in a letter dated December 31, 1996. The letter also informed the plaintiff that he could request a review of the decision and that he could submit within 60 days any additional medical information in support of his disability claim. (*Id.*, at TX0156).

The plaintiff requested further review. Group Benefits Analyst Karen Stuart Jordan was designated to review the claim. (*Id.*, Ex. 1 D, at TX0149). She wrote the plaintiff a letter informing him that she had been designated to review the file. She also inquired as to whether he had "undergone the Functional Capacity Evaluation [(FCE)] recommended by Dr. Kezar."[3] (*Id.*, Ex. 1 D, at TX0149).

The defendant hired an investigative agency to surveil the plaintiff on the recommendation of Jordon after she reviewed the file and concluded that the medical information from the physicians and the plaintiff suggested no objective finding to support the plaintiff's subjective pain complaints. (*Id.*, Ex. 1 N, at TX0154). She also noted that Dr. Kezar stated that the plaintiff's complaints were inconsistent on repeat exams. (*Id.*). The only noteworthy

_____

[3] According to Dr. Michael Hammer's deposition, an FCE is "an evaluation of the patient in terms of what tests they can perform, what muscle strength they have, endurance, what is limited by pain." (Doct. 17, Ex. 3, p. 24).

3

observation during the surveillance was on January 18, 1997. At approximately 7:30 p.m., the plaintiff was observed leaving his residence. He entered his car and was accompanied by three other persons who followed him from the residence in another car. He went into a video store and returned to his car. He then traveled Intestate 65 to downtown Birmingham. He went to the Birmingham-Jefferson County Civic Center for a showing of "CATS." He was observed leaving his car and returning approximately three hours later. He proceeded home, arriving at about 11:40 p.m. The investigators noted that he entered and exited the car and walked without any difficulty. (*Id.*, Ex. 1 M, at TX0135-37).[4]

Jordan spoke on the telephone with the plaintiff on January 22, 1997. Her notes of their conversation described his daily activities as including approximately twenty (20) hours a day in bed, on the couch, or in a recliner. (*Id.*, Ex. 1 F, at TX0146). According to the notes, he told her that he was able to get groceries, drive short distances, and do light cleaning; but, his roommate did the outside yard work and heavy cleaning. He also told her that he had gone to a play, but had to take pain pills before the show. (*Id.*, at TX0146-47).

While the review was pending, two FCEs were performed. The first was conducted by a clinician chosen by the plaintiff. It was performed on April 2, 1997, by Howell Tapley. (Doct. 17, Ex. K). The summary portion of the report reveals that the plaintiff arrived thirty minutes late for the test. He stated that his lateness was due to difficulties in "'getting moving' and that pain had slowed him down." (*Id.*, TX0221). It states that the plaintiff terminated the testing twice on his own. (*Id.*). It also states that "[b]ased on the limited amount of test data derived

---

[4] One of the investigators noted that after the performance the plaintiff sat down in his vehicle so hard that he appeared to bounce. (*Id.*, TX0137).

4

from Mr. Cagle's ability (sic) to complete the FCE protocol, we are unable to attest to the validity of maximum effort." (*Id.*). Although the tests were limited by the plaintiff's termination of the testing session, the examiner concluded that he had a "Total Combined Whole Person Impairment" of 17%. (*Id.*, at TX0222). The report was submitted to the defendant by the plaintiff on April 18, 1997.

A second FCE was performed at the defendant's request by Annette Harris on May 9, 1997. According to the report, the plaintiff did not complete the FCE test due to pain. The clinician noted, however, that the plaintiff's complaints of pain were inconsistent with his physiological responses during the testing. (*Id.*, Ex. L, at TX0189 and 0191). She wrote that the plaintiff "always gave some reason to prevent cross-validation of his level of effort and to prevent observation of his actual available capacities." (*Id.*, at TX0189). She further noted that his ability to ascend and descend the stairs at the testing facility during and after the evaluation was inconsistent with his claimed inability to perform a "heel-toe walk." (*Id.*). She concluded that the plaintiff abused the opportunity for objective evaluation of his functional capacities. (*Id.*, at TX0190). She went on to recommend that "no impairment rating be given or decision be made to award long-term disability until [the plaintiff] decides to allow objective evaluation of his functional capacities." (*Id.*). Finally, she wrote:

Unless there is some medical history that has not been reported, there should not be any reason that [the plaintiff] would not be able to resume full-time light duty work with some potential for physical capabilities comparable to at least the medium DOT capacity if he is so motivated. An appropriate job would be a monitor tech position during which he could sit and stand as he states is necessary. . . .

(*Id.*).

5

After reviewing the plaintiff's medical records and the reviews conducted by other personnel associated with the defendant,[5] the FCE reports, and the surveillance report, Ms. Jordan recommended that the defendant reaffirm the denial of benefits, as the plaintiff was not totally disabled. (*Id.*, Ex. 1, pp. 3-5; Ex. 1 N, at TX0122). The defendant notified the plaintiff of its decision in a letter dated August 22, 1997. It provided, in pertinent part:

> The medical records we have from your treating physicians did not sufficiently identify the extent of your functionality. You voluntarily submitted to a Functional Capacity Evaluation and we also scheduled one for you. The results of each were similar. Neither clinician could attest to the validity of your efforts during the evaluation. Both found that the exam needed to be interrupted due to complaints of pain by you. This limited the amount of test data that could be obtained. Our examiner however, made additional observations during the exam of your vital statistics before and after the complaints of pain, the inappropriate height of your cane, your ability to ascend and descend stairs during breaks etc...[.] She found that these findings were not consistent with your stated complaints. We also had your activities observed and found that your activities were not consistent with your stated limitations.

> Since the information contained in our file does not support total disability as defined, we must reaffirm our decision to decline your application for benefits.

> We have based our determination on all the medical information we have received. . . .

(*Id.*, Ex. 1 D, at TX0118-19).

The present action was filed in Jefferson County Circuit Court on August 21, 1997. The matter was removed to this court on September 30, 1997. (Doct. 1).

## II. DEFENDANT'S MOTION TO STRIKE CERTAIN EVIDENCE

The defendant has filed a motion to strike certain documents submitted by the plaintiff in

---

[5] These included medical records from Drs. Kezar, Chiou, Godfryd, Felgner, and MacMurray and from UAB Hospital (Doct. 17, Ex. 1, ¶¶ 8-10; Ex. 1 G), Kezar's Attending Physician Statement (Doct. 17, Ex. 1 H), and the notes of Bill Gauge and Dr. Fazzari (Doct. 17, Ex. 1,¶¶ 11-12; Ex. 1 I and J).

opposition to the summary judgment motion. (Doct. 20). Specifically, it objects to (1) Exhibit A 2, which purports to be a handwritten note of Stenger dated December 23, 1996 (Doct. 19, Ex. A 2); (2) Exhibit A 3, which purports to be a copy of an excerpt from the UAB Long Term Disability Program Booklet (*Id.*, Ex. A 3); (3) Exhibit A 4, which purports to be additional notes of Stenger (*Id.*, Ex. A 3); and (4) Exhibit 7, pages TX0353-63, which purports to be records from the UAB Department of Family and Community Medicine (*Id.*, Ex. A 14).[6]

The plaintiff initially opposed the motion asserting that the documents at issue were produced by the defendant as being their file on his claim. (Doct. 21). Counsel for the plaintiff filed an affidavit asserting that the plaintiff "could not present by affidavit testimony from [the defendant] regarding these documents because such information is in the exclusive possession and control of [the defendant]." (Doct. 22, ¶ 5). The plaintiff also asserted that the defendant had "no reasonable basis to deny the authenticity of memorandums from its file made by its employees and has frivolously denied the authenticity of documents it produced (bearing its stamp number) from its files." (*Id.*, ¶ 6).

The defendant's objections to the purported notes of Stenger (exhibits A 2 and A 4) generally concern the lack of authentication. Under *Federal Rule of Evidence* 901, the plaintiff must establish "that the matter in question is what its proponent claims." *Fed. R. Evid.* 901. The affidavit of Ms. Jordan and the attachments thereto identify Kathleen Stenger as the Group Benefits Analyst assigned the plaintiff's case. (Doct. 17, Ex. 1 D and E). The affidavit of

---

[6] The defendant cites to exhibit 7 as containing these records; however, they are actually found in exhibit 14 of the plaintiff's submission (doct. 19).

7

plaintiff's counsel states that these documents were produced by the defendant during discovery.[7]

Additionally, the court can see that the handwriting attributed to Stenger is identical on both

documents, one of which is signed "Kathy Stenger." The court finds that these circumstances are

sufficient for the court to conclude that the objected-to notes in exhibits A 2 and A 4 are what the

plaintiff claims and, therefore, they will be considered with the motion. *See Snyder v. Whittaker

Corp.*, 839 F.2d 1085, 1089 (5th Cir. 1988). Accordingly, this portion of the motion is due to be

denied.

To the extent that the defendant asserts that the remaining notes (exhibit A 4, TX0112-

15), which appear to be a review of various medical records by Stenger, are not sufficiently

placed in context by a supporting affidavit or other admissible evidence to be considered on the

motion for summary judgment, the court finds otherwise. As already noted, Stenger was the first

line reviewer on the claim; the defendant requested records from Drs. Felgner, MacMurry, and

Chiou, and UAB, which were provided (*see* doct. 17, ex. 1 D, at TX0155-56, 165); the records,

or at least pertinent portions of them, from Chiou, Kezar, MacMurry, and UAB are attached to

the various pleadings (*see* doct. 17, ex. 1 G and H; doct. 19, ex. A 14); and Stenger stated in her

letter to the plaintiff that she reviewed the records (*see* doct. 17, ex. 1 D, TX0155). Accordingly,

this portion of the motion, addressing exhibit A 4, TX0112–15, is due to be denied as well.[8]

Concerning the disability booklet offered by the plaintiff, the court again notes that due to

the "TX" number located on the document, it is evident that this document was produced during

---

[7] This fact is borne out by the "TX" notation in the lower right-hand corner of the documents.

[8] An examination of the medical records at document 19, exhibit 14, TX0353-63, demonstrates that Stenger's notes in the objected-to pages correlate with many of these records.

8

discovery. However, the court has also noted that the applicable provisions under the group term policy have been modified numerous times since it was issued. Neither the booklet nor any other affidavit or document demonstrates that the booklet includes all the applicable amendments at the time of the disability claim in 1996.[9] Accordingly, this portion of the motion is due to be granted. The court would note, however, that the portions highlighted by the plaintiff in the exhibit are included in the defendant's exhibits, particularly the Group Total Disability Benefits Policy. (*See* Doct. 17, Ex. 1 A).

The defendant's last objection to the medical records from UAB asserts that they are due to be excluded as "it is unclear what physician or health-related professional made these notes." (Doct. 20, p. 3). Premised on the foregoing discussion, the court finds that it was sufficiently clear to Stenger at the time of her review, and now to the court, that the objected-to records (TX0353-63) pertained to the plaintiff and were from UAB, particularly Dr. MacMurray. Additionally, to the extent the defendant complains that Dr. MacMurray's name does not legibly appear on the records, the court disagrees. Finally, to the extent that the defendant complains about undefined abbreviations in the documents, the court notes that many of the defendant's exhibits contain similar abbreviations and the court does not feel unduly hampered by the existence of such limitations. Accordingly, this portion of the motion to strike is due to be denied.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is to be granted only if "the pleadings, depositions, answers to

---

[9] The court recognizes that the first page of the exhibit contains the following label: "Long Term Disability Program 2/1/94, Booklet and Excerpt from 4/1/97." (Doct. 19, Ex. A 3).

9

interrogatories, and admissions on file, together with the declarations, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." *Fed. R. Civ. P.* 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct.

2548, 91 L. Ed. 2d 265 (1986). The party asking for summary judgment "bears the initial burden

to show the district court, by reference to materials on file, that there are no genuine issues of

material fact that should be decided at trial. Only when that burden has been met does the

burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact

that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.

1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142

(1970).

  The movant can meet this burden by presenting evidence showing there is no dispute of

material fact, or by showing that the nonmoving party has failed to present evidence in support of

some element of his case on which he bears the ultimate burden of proof. *Celotex,* 477 U.S. at

322-23; *see Fed. R. Civ. P.* 56(a) and (b). Once the moving party has met his burden, Rule 56(e)

"requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the

'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

showing that there is a genuine issue for trial,'" *Celotex*, 477 U.S. at 324. The nonmoving party

need not present evidence in a form necessary for admission at trial; however, the movant may

not merely rest on the pleadings. *Id.*

  After a motion has been responded to, the court must grant summary judgment if there is

no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

*Fed. R. Civ. P.* 56(c). Rule 56(c) mandates the entry of summary judgment against a party who

10

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249. A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 259; *see Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 745 n.11, 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983). *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 643 (11th Cir. 1997). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matusushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson,* 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman,* 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson,* 477 U.S. at 254; *Cottle v. Storer Communication, Inc.,* 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the

11

function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Allen*, 121 F.3d at 643.

## IV. DISCUSSION OF THE MERITS

The plaintiff brings this action, seeking payment of the benefits he believes he is entitled under the group disability policy and seeking damages for bad faith denial of those benefits by the defendant. The defendant has filed a motion for summary judgment, asserting that it is entitled to a judgment as a matter of law on the bad faith claim. It also asserts that the defendant is entitled to summary judgment on the claim for punitive damages.

### A. Bad Faith

#### 1. Generally

The parties correctly note the elements of a bad faith claim:

(a)     an insurance contract between the parties and a breach thereof by the defendant;
(b)     an intentional refusal to pay the insured's claim;
(c)     the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
(d)     the insurer's actual knowledge of the absence of any legitimate or arguable reason;
(e)     if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.

*National Security Fire & Cas. Co. v. Bowen*, 417 So. 2d 179, 183 (Ala. 1982). In *Bush v. Ford Life Ins. Co.*, 682 So. 2d 46 (Ala. 1996), the Alabama Supreme Court stated:

12

When this Court created the bad-faith tort in *Chavers v. National Security Fire & Casualty Co.*, 405 So. 2d 1, 7 (Ala. 1981), it stated:

> [A]n actionable tort arises for an insurer's intentional refusal to settle a direct claim where there is either "(1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal."

Later, in *National Security Fire & Casualty Co. v. Bowen*, 417 So. 2d 179, 183 (Ala. 1982), this Court held:

> No lawful basis "means that the insurer lacks a legitimate or arguable reason for failing to pay the claim." *Atlantic Gulf Life Ins. Co. v. Barnes*, [405 So. 2d 916 (Ala. 1981)]. When a claim is "fairly debatable," the insurer is entitled to debate it, whether the debate concerns a matter of fact or law.

> This Court has held that the plaintiff must go beyond a mere showing of nonpayment and prove bad faith nonpayment, a nonpayment without any reasonable ground for dispute--a failure to pay even though the insurer had no legal or factual defense to the claim. *Bush v. Alabama Farm Bureau Mut. Casualty Ins. Co.*, 576 So. 2d 175 (Ala. 1991) . . . .

> In *National Savings Life Ins. Co. v. Dutton*, 419 So. 2d 1357 (Ala. 1982), this Court emphasized the heavy burden a plaintiff must bear in a bad faith case:

> > In the normal case in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law. Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the tort claim must fail and should not be submitted to the jury.

> 419 So. 2d at 1362. *Dutton* also stated that "[w]hether an insurance company is justified in denying a claim under a policy must be judged by what was before it at the time the decision [was] made." *Id.* . . .

*Bush*, 682 So. 2d at 48-49. Proof of "mere negligence or mistake is not sufficient to support a

claim of bad faith; there must be a refusal to pay, coupled with a conscious intent to injure."

*Davis v. Cotton States Mutual Ins.*, 604 So. 2d 354, 359 (Ala. 1992).

### 2. December 31, 1996 Denial

The defendant asserts that it is entitled to summary judgment on this claim since it had legitimate, debatable reasons for denying his claim. The plaintiff asserts that the defendant had no such reason.

The record shows that on December 12, 1996, Stenger perceived that the medical information supported the plaintiff's claimed inability to work.[10] Her assessment was submitted to registered nurse Bill Guage and Dr. Fazzari for their impressions. (Doct. 17, Ex. 1, ¶¶ 11, 12 and Ex. 1 I and J; Doct. 19, Ex. A 4, at TX0111). Stenger's medical records review on the same date shows that the plaintiff's pain appeared to be limiting his physical capacity, activity, and ability to work. (*Id.*, at TX0112-14). She wrote that Dr. Felgner stated that the plaintiff was unimproved and "completely limited." (*Id.*, at TX0115). The plaintiff's last visit with Felgner was on October 10, 1996, some two months before the review. (*Id.*). Stenger also wrote that Dr. Godfryd stated that the plaintiff was limited in his ability to ambulate and was "house confined." (*Id.*). Godfryd last saw the plaintiff on October 11, 1996, approximately two months before her review. (*Id.*). Stenger further wrote that Dr. MacMurray stated, "unimproved, TD-yes, class 3 physical impairment, his physical capacity is limited by pain. No definite objective reason for continued pain though at this time continued pain limits physical capacity & ability to work." MacMurray last saw the plaintiff on November 15, 1996. Stenger's review of medical records from the back clinic states: ". . .does not believe current condition s/b disabling to him but cannot

---

[10] Her notes specifically state: "I think the medical information supports inability to work as RN at this time. Do you agree?" (Doct. 19, Ex. A 4, TX0111).

14

do regular job which requires heavy lifting."[11]  (Doct. 19, Ex. A 4, at TX0114).

The medical records available for review before the first denial also included those from Dr. Laura Kezar, an Assistant Professor of Physical and Rehabilitation Medicine at UAB Hospital. She and UAB resident Dr. Billy Chiou saw the plaintiff numerous times between his August injury and the December decision to deny him benefits.  (Doct. 17, Ex. 4, pp. 8, 13-15). Dr. Kezar's notes from the plaintiff's November 5, 1996 visit show the radiological studies that were done evidence some degenerative changes, some disc desiccation, and a disc bulge. (*Id.*, Ex. G, at TX0297).  There was no disc herniation or evidence of neural compression. (*Id.*).  She stated that "[t]here was no clear objective evidence of neurological dysfunction in the LEs although the patient has subjective sensory complaints which are inconsistent on repeat exams." (*Id.*).  Dr. Kezar also noted that the plaintiff asked about long term disability in this visit.  She told him that she did "not believe his current condition should be disabling to him.  He is likely not ready to return to his previous job which requires a significant amount of heavy lifting. I am unable to predict whether he will return to this type of job in the future although I am hopeful that the Pain Clinic may offer his (sic) other treatment modalities which will improve his symptomatology and to allow him to make more progress in therapy." (*Id.*).  In her plan notes, Dr. Kezar stated: "Obviously, I do not believe that Mr. Cagle is permanently disabled from this condition.  I am optimistic that he will be able to return to work in some capacity and would strongly recommend a Functional Capacity Evaluation [(FCE)] and Impairment Rating at the conclusion of treatment in the Pain Center." (*Id.*, at TX0298).

---

[11]  As best the court can determine, this note relates to a November 5, 1996 visit, but the comment is not clearly attributed to a particular person, e.g. the plaintiff, a clinician, or a doctor.

15

Dr. Kezar's October 22, 1996 charting states that, premised on her conversation with the physical therapist, the plaintiff's "[s]ymptoms have been inconsistent, with strong suspicion for symptom magnification." (*Id.*, at TX0300). She also completed the Attending Physician Statement on this day. (*Id.*, at TX0302). She did not answer the questions regarding the degree of any physical impairment or disability suffered by the plaintiff. She stated that a FCE would be necessary in order to assess these areas. (*Id.*, at TX0366). The Statement was submitted to the defendant on November 22, 1996. (Doct. 17, Ex. 1 H, at TX0364).

Guage is a registered nurse with extensive orthopaedic care experience. (Doct. 17, Ex. 1, ¶ 11). He found, on December 16, 1996, that Kezar's notes in October and November 1996 did not indicate any objective evidence for the plaintiff's persistent pain and that she suspected symptom magnification. (*Id.*, Ex. 1 I). He also noted her comments about the inconsistency of the plaintiff's complaints from exam to exam and that the medical doctors were not "strongly impressed by clinical presentation." (*Id.*). He also questioned whether the "meds" are documenting the plaintiff's inability to work. (*Id.*).

Dr. Fazzari is a licensed physician specializing in physical medicine and rehabilitation. (Doct. 17, Ex. 1, ¶ 12). After reviewing the records, he concluded that the

. . .anatomical findings-impairment-appear not to support the degree of loss of function expressed or demonstrated by the patient.

This is not atypical of chronic pain patients.

According to the medical records available-findings on examination also do not support the degree of disability expressed.

(Doct. 17, Ex. 1 J, at TX0108). He notes that the medical history is lacking. Specifically, he found that the EMG/NCV study lacks sensory nerve information and that there is no psycho-

16

social evaluation. (*Id.*). He also was troubled that the plaintiff seemed unwilling or unable to participate in the physical therapy. He concluded that the medical records at that time did "not support the full degree of disability expressed." (*Id.*, at TX0109).

On December 31, 1996, Stenger signed a letter denying the plaintiff's claim. It states that "the information received from your physicians does not establish disability as defined [in the policy] for ninety days . . . ." (Doct. 17, Ex. 1 D, at TX0155). Reviewing all the evidence, including the assessments of Stenger, Gauge, and Fazzari and the medical records submitted on this motion, the court concludes that the defendant had an arguable reason at that juncture to believe the plaintiff was not totally disabled and for refusing to pay. To find otherwise would require the court to ignore substantial evidence that there were significant reasons to dispute payment. For instance, Kezar noted, and Guage and Fazzari acknowledged, inconsistent symptoms, the lack of objective evidence supporting the claims of persistent pain and full disability, and symptom magnification. Kezar specifically noted on November 5, 1996, that she did not believe he was permanently disabled. She was optimistic that he would be returning to work in some capacity. (Doct. 17, Ex. 1 G, at TX0298). Additionally, Kezar stated that a FCE was necessary to answer questions concerning any physical impairment and the extent of any disability. (Doct. 17, Ex. 1 H, at TX0366). As of the date of the first denial, no one had performed a FCE, either one requested by the defendant or by the plaintiff's health care providers.

The court further finds that at the time the defendant first denied the plaintiff's claim, the evidence was not such that "the plaintiff is entitled to a directed verdict on the contract claim." *Dutton,* 419 So. 2d at 1362. To support a directed verdict, the evidence must be one-sided.

Under Alabama law, it is well-settled that "[a] directed verdict is proper only where there is a complete absence of proof on a material issue or where there are no controverted questions of fact on which reasonable people could differ." *Deaton, Inc. v. Broughton*, 456 So. 2d 897, 899 (Ala. 1984). The Eleventh Circuit Court of Appeals has stated that a directed verdict is only proper where, when considering the evidence in a light most favorable to the opposing party, the facts and inferences "'so overwhelmingly favor the verdict' that no reasonable juror could reach a contrary decision." *Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Florida*, 140 F.3d 898, 905 (11th Cir. 1998). There clearly was an issue of fact on the disability claim at that point. The evidence was not so one-sided as to allow the granting of a directed verdict in favor of the plaintiff. Accordingly, the motion for summary judgment on the bad faith claim is due to be granted.

The plaintiff asserts that the defendant's bad faith is demonstrated by the defendant's failure to pay the disability claim from December until the FCE tests were completed. (Doct. 30, p. 10). He cites *Burns v. Motors Insurance Corp.*, 530 So. 2d 824 (Ala. 1987), in support of his position. In *Burns*, the defendant company began paying the plaintiff after her physician submitted a statement that she was totally disabled. *Burns*, 530 So. 2d at 827. Pursuant to the company practice, the file was left open for re-evaluation. The follow-up review demonstrated that no other physician wold support the position of the plaintiff's physician. The defendant discontinued the payments and the plaintiff sued, including a claim for bad faith. The court upheld the trial court's decision granting summary judgment for the defendant on the bad faith claim, finding that the defendant had debatable reasons for denying the claim each instance it did so. *Burns*, 530 So. 2d at 828.

18

*Burns* is factually inapposite to the matter before the court. Unlike *Burns*, the
information before the defendant herein was inconsistent. At the outset, the insurer in *Burns*
only had the statement of the plaintiff's physician that she was "totally disabled" under the
applicable policy. Here, Dr. Kezar specifically noted in her attending physician's statement that
the extent of the plaintiff's disability was not assessed. (Doct. 17, Ex. 1 H, TX0366). As already
noted there were issues and questions in this matter concerning the plaintiff's disability
beginning around November 1996. Further, *Burns* does not stand for the proposition that where
there are debatable reasons for not paying a claim, the defendant acts in bad faith if it denies the
claim rather than paying it until the determination is conclusive. To the contrary, the court held
that the grant of summary judgment on the bad faith claim was appropriate as the defendant's
first two denials of the plaintiff's claim were premised on evidence that the defendant's failure to
pay was due to the fact that the defendant was "unable to conclusively determine, pursuant to its
own claims process, whether [the plaintiff] was fully disabled."[12] *Id.*

### 3. August 22, 1997 Denial

After the plaintiff requested a review of the defendant's December 31, 1996 denial of his
claim, additional inquiry was made into the matter. Within approximately seven days, the claim
was assigned to Jordan for review. She immediately inquired whether the plaintiff had
undergone the FCE recommended by Dr. Kezar. (Doct. 17, Ex. 1 D, TX0149). Within
approximately eleven days of the denial, an investigative agency was contacted and had
commenced a surveillance of the plaintiff's activities. Two FCEs were performed by separate

---

[12] The court upheld the third denial of the plaintiff's claim in *Burns* after it was determined that the plaintiff had lied
in the application for the policy. *Burns*, 530 So. 2d at 827.

medical groups during April and May 1997.

This additional information was submitted to the defendant for review. It supports the defendant's position concerning its further denial of the plaintiff's claim on August 22, 1997. Besides the earlier information and evaluations noted above, the defendant was now also aware that the FCEs raised questions concerning the effort put forth by the plaintiff in the tests. (Doct. 17, Ex. 1 K, at TX0221; Ex. 1 L, at TX0190). Additionally, at the second FCE, performed at the defendant's request, the evaluator noted that the plaintiff's complaints of pain were inconsistent with his physiological responses, he always presented reasons that prevented cross-validation of his efforts, and his actions at times were inconsistent with his claimed inability to perform certain tests. (Doct. 17, Ex. 1 L, at TX0189-91). Still further, the defendant was privy to the surveillance report submitted by the investigative agency. Although the report was unremarkable for the most part, the Saturday, January 18, 1997, events concerning the plaintiff's absence from his residence for approximately four hours was properly considered by the defendant in making its decision not to pay the claim.

Under the applicable standard, the court finds that the August 22, 1997 decision, denying the plaintiff's claim, was premised on a "fairly debatable" reason that the defendant was entitled under the law to debate. *Bush*, 682 So. 2d at 48, *quoting National Security Fire & Cas. Co. v. Bowen*, 417 So. 2d at 183. Accordingly, as with the December 31, 1996 denial, the defendant's motion for summary judgment is due to be granted on the bad faith claim involving this denial.[13]

The court also notes that if the plaintiff is asserting that the defendant intentionally failed

---

[13] Each denial has been treated separately as the court is not convinced that the December 31, 1996 denial, if it had been supported by a sufficient showing, could not have been a basis for recovery.

20

to determine whether there was a legitimate or arguable reason to deny benefits on either December 31, 1996, or August 22, 1997, there is no evidence to support such a claim. The evidence shows that the defendant not only reviewed the records, but also requested surveillance of the plaintiff and a FCE review. However, even if there were such evidence, the existence of a debatable reason for denying the claim would render the inquiry irrelevant. *Insurance Company of North America v. Citizens Bank of Thomasville*, 491 So. 2d 880, 885 (Ala. 1986).

## B. Punitive Damages

Having found that summary judgment is due to be granted for the defendant on the bad faith claim, the defendant's motion for summary judgment on the plaintiff's request for punitive damages is moot. However, had the court denied the motion on the bad faith claim, the defendant would be entitled to summary judgment on the punitive damages request.

> Alabama allows recovery of punitive damages [in a bad faith claim] when the plaintiff shows that he suffered, at least, nominal damage and that the acts complained of were committed with malice, willfulness, or wanton and reckless disregard of the rights of others. *Mid-State Homes, Inc. v. Johnson*, 294 Ala. 59, 311 So. 2d 312 (1975); *Ray Hughes Chevrolet, Inc. v. Gordon*, 294 Ala. 638, 320 So. 2d 652 (1975). Thus, for punitive damages to be awarded in Alabama, a defendant must not only intentionally have breached his duty of good faith, but in addition must have committed acts of the nature described above.

*Gulf Atlantic Life Ins. v. Barnes*, 405 So. 2d 916, 925 (Ala. 1981). There is no evidence before the court of "malice, willfulness, or wanton and reckless disregard of the rights" of the plaintiff. The plaintiff's conclusory claims of willfulness, recklessness, and malice in the "Narrative Summary of Fact" (*see* doct. 30, p. 19) is not sufficient to defeat the motion for summary judgment.

21

## V. CONCLUSION

Premised on the reasons stated above, the defendant's motion to strike (doct. 20) is due to

be granted in part and denied in part and the defendant's motion for summary judgment (doct.

16) is due to be granted.

**DONE** this the 16th day of June, 1999.

                                            _____

                                            JOHN E. OTT
                                            UNITED STATES MAGISTRATE JUDGE